**FIRST DIVISION
BARNES, P. J.,
MCMILLIAN and MERCIER, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**December 7, 2017**

# In the Court of Appeals of Georgia

A17A1549. WINGLER et al. v. WHITE et al.

BARNES, Presiding Judge.

The plaintiffs, Shirley and Nile Wingler, were injured when a speeding car driven by a suspect who was fleeing law enforcement crashed into their car. They sued the sheriffs of Lamar and Monroe Counties in their official capacities (the "Lamar Sheriff" and "Monroe Sheriff"), alleging that the reckless conduct of the sheriffs' deputies in initiating and continuing the high speed car chase proximately caused the injuries they sustained in the automobile collision. The trial court granted summary judgment to the Lamar Sheriff on the grounds that the plaintiffs' claims against him were barred as a matter of law by sovereign immunity; that the plaintiffs failed to establish proximate causation because the uncontroverted evidence showed that the Monroe deputies had taken exclusive control of the pursuit by the time of the collision; and that the plaintiffs failed to come forward with any evidence that the Lamar deputy involved in the pursuit acted with reckless disregard for proper law

enforcement procedures. The trial court granted summary judgment to the Monroe Sheriff on the ground that the plaintiffs failed to come forward with any evidence that the Monroe deputies acted with reckless disregard for proper law enforcement procedures.

The plaintiffs now appeal these summary judgment rulings by the trial court. For the reasons discussed more fully below, we conclude that the trial court committed no error in granting summary judgment to the Lamar Sheriff on sovereign immunity grounds. In contrast, we conclude that the trial court erred in granting summary judgment to the Monroe Sheriff because when the evidence is construed in favor of the plaintiffs, genuine issues of material fact exist as to whether the Monroe deputies acted with reckless disregard for proper law enforcement procedures in continuing the high speed chase. We therefore affirm in part and reverse in part.

Summary judgment is proper if the pleadings and evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." OCGA § 9-11-56 (c). On appeal from the trial court's grant of summary judgment, "we review the evidence de novo, and all reasonable conclusions and inferences drawn from the evidence are construed in the light most

favorable to the nonmovant." (Citation and punctuation omitted.) *MCG Health v. Barton*, 285 Ga. App. 577, 578 (647 SE2d 81) (2007).

So viewed, the record shows that on the morning of February 6, 2013, sheriffs' deputies from Lamar and Monroe Counties pursued a driver fleeing from a routine traffic stop on a high speed chase that extended over 45 miles through several Georgia counties and reached speeds of 120 to 125 miles per hour.[1] The car chase began on Interstate 75 ("I-75") when a sheriff's deputy attempted to pull over a car allegedly for failing to maintain its lane of travel. The chase ended after the fleeing driver exited onto Georgia State Highway 247 ("Highway 247"), where he ran a red light and crashed into the plaintiffs' car in a congested intersection. What follows is a more detailed account of what transpired based on the evidence presented by the plaintiffs.

Around 10:00 a.m., a Lamar County sheriff's deputy was in his patrol car monitoring southbound traffic on I-75 about three miles from the Monroe County line. The deputy was part of Lamar County's Interstate Criminal Enforcement ("ICE")

---

[1] Several depositions in the record were sealed when transmitted to this Court and have been opened here for our consideration. "These depositions are properly considered to determine whether the facts of the case create an issue of material fact for determination below." *Kaiser v. Tara Ford, Inc.*, 248 Ga. App. 481, 482, n. 2 (546 SE2d 861) (2001).

Unit, which attempts to identify and apprehend drug traffickers and other serious offenders by "profiling potential suspects based on their driving behaviors."[2]

While monitoring southbound traffic on I-75, the Lamar deputy saw a silver car with a Florida license tag traveling in the center lane that the deputy later testified was "straddling" the lane divider between the center and right lanes of the interstate.[3] When the deputy activated his blue lights to pull over the driver for the traffic violation of failure to maintain a lane of travel, the driver initially hesitated and appeared to be on his cell phone but then accelerated. The Lamar deputy decided to engage in a vehicle pursuit, activated his siren, alerted the police dispatcher that a pursuit was underway, and asked the dispatcher to notify the Monroe County Sheriff's Department. The deputy provided the license tag number of the car to the police dispatcher and learned that it was a rental car that had not been reported missing or stolen.

---

[2] A second Lamar County sheriff's deputy, who also was a member of the ICE Unit, was a passenger in the patrol car.

[3] The dash cam video recording from the Lamar County patrol car does not show the silver car "straddling" the lane divider, but the recording starts after the patrol car had already begun pulling up closer to the silver car.

When the Lamar deputy initiated the pursuit for the traffic violation, the weather was clear and dry and there was moderate traffic on the interstate. The pursuit quickly reached speeds of up to 120 to 125 miles per hour, with both the Lamar patrol car and fleeing car weaving in and out of traffic and other vehicles moving out of the way and off of the road to avoid a collision. The fleeing driver was "very aggressive" and "was driving all over the road," and the Lamar deputy remarked over the radio that fleeing drivers "get stupid." As the Lamar deputy and the fleeing driver continued weaving through traffic, the deputy commented over the radio, "Come on, get out of the way. They going to wreck."

About 10 miles after the pursuit entered Monroe County, three patrol cars driven by deputies of the Monroe County Sheriff's Department joined the chase. The police dispatcher advised the Monroe deputies and their supervisors who were listening over the radio that the pursuit was for the driver's failure to stop for a "routine traffic stop" and indicated that there were no "warrants . . . or anything like that" for the driver. Although disputed, there was evidence that the Monroe deputies and their supervisors did not inquire further into the reason for the pursuit or learn the specific violation that had been committed by the driver that precipitated the attempted stop. All of the deputies continued pursuing the fleeing driver at a high rate

of speed with their lights and sirens activated. When one of the deputies was asked over the radio whether he could drive in front of the fleeing driver to slow him down, the deputy responded, "No, not in this traffic."

The Lamar and Monroe deputies continued the high speed pursuit southbound onto Interstate 475 ("I-475"), which the Lamar deputy noted over the radio "gets real congested." One of the deputies pointed out over the radio that the fleeing driver was "all over the place," and the deputies advised the dispatcher that the driver was "going all over the place, weaving back and forth." One of the Monroe deputies later testified that the fleeing driver had been "erratically" changing lanes without signaling and was going into the emergency lane to avoid traffic. At times during the chase, the pursuing deputies drove within two or three car lengths of the fleeing driver and in the lane next to him, but they were unable to force him to slow down or stop. Other deputies positioned on foot on the side of the interstate also attempted to disable the fleeing car by throwing down "stop sticks" onto the road, but the driver evaded them. Additionally, the Monroe deputies planned to perform a precision immobilization technique ("PIT maneuver") to stop the fleeing driver, but they were unable to get into position to perform the PIT maneuver during the chase.

6

During the pursuit on I-475, the Lamar deputy allowed the Monroe deputies to take the lead. As the pursuit continued, the Lamar deputy's patrol car hit the median, blew a tire, and had to drop out of the chase altogether. The Monroe deputies continued the high speed pursuit for approximately 20 more miles after the Lamar deputy was forced out of the pursuit by the blown tire.

According to the Monroe deputies, the driver of the fleeing car at one point during the continued pursuit on I-475 threw a "white powdery" substance out of his car window, which hit the front of one of the deputies' patrol cars and exploded. However, the dash cam video recording from one of the Monroe County patrol cars does not show a white powdery substance being thrown or striking any of the patrol cars and exploding,[4] transcripts of the audio recorded police communications do not contain any reference to the thrown powder, and the fleeing driver was never charged with any drug offenses related to the alleged powder.

The fleeing driver exited onto Highway 247, which was congested with heavy traffic and contained four-way intersections controlled by traffic lights. The fleeing driver continued at a high rate of speed, drove onto the grassy median to avoid traffic,

_____

[4] The record contains a dash cam video recording from only one of the three Monroe County patrol cars involved in the chase. The parties dispute whether the thrown powder would have been visible from the vantage point of the recording.

7

and proceeded through congested intersections. The pursuing Monroe patrol cars slowed down but continued to have their lights and sirens activated. Ultimately, the fleeing driver drove at a high rate of speed through a red light at an intersection near Galleria Mall and collided with the plaintiffs' car, causing the plaintiffs to sustain serious injuries. The driver of the fleeing car, a young man, was apprehended after initially attempting to flee on foot. A small bag of marijuana was found in his car, and he was driving with a suspended license. The fleeing driver later pled guilty to two counts of serious injury by vehicle and other offenses, resulting in a 20-year sentence.

The plaintiffs sued the Lamar and Monroe Sheriffs in their official capacities for the injuries they sustained in the automobile collision. The plaintiffs alleged that the sovereign immunity otherwise afforded the defendant sheriffs when sued in their official capacities was waived because the plaintiffs' injuries arose out of the deputies' negligent use of county motor vehicles. See OCGA §§ 33-24-51 (b); 36-92-2 (a), (d). The plaintiffs further alleged that the sheriffs' deputies from both counties that pursued the fleeing car acted with reckless disregard for proper law enforcement procedures by initiating and continuing a dangerous high speed chase based on a minor traffic offense and thus were the proximate cause of the accident. See OCGA § 40-6-6 (d) (2).

8

Following discovery, the defendant sheriffs moved for summary judgment. The Lamar Sheriff argued that the claims against him were barred by sovereign immunity because the Lamar deputy's patrol car had become disabled and was no longer involved in the pursuit when the plaintiffs sustained their injuries, such that the car was not in "use" as a county motor vehicle as that term has been strictly construed under our precedent. Alternatively, the Lamar Sheriff argued that the plaintiffs could not establish proximate causation with respect to the Lamar deputy because the pursuit was under the exclusive control of the Monroe deputies when the collision occurred, and that the plaintiffs failed to present any evidence that the Lamar deputy acted with reckless disregard for proper law enforcement procedures. The Monroe Sheriff did not contest that Monroe County's sovereign immunity had been waived, but argued that the plaintiffs failed to present any evidence that the Monroe deputies acted with reckless disregard for proper law enforcement procedures.

The plaintiffs opposed the summary judgment motions, relying primarily upon the dash cam video recordings from the patrol cars, the transcripts of the audio recorded police communications during the pursuit, and expert testimony regarding proper law enforcement pursuit procedures to support their claims. After conducting

9

a hearing on the motions, the trial court granted summary judgment to the defendant sheriffs on all of the asserted grounds. This appeal by the plaintiffs followed.

1. The plaintiffs first argue that the trial court erred in concluding that their claims against the Lamar Sheriff were barred as a matter of law by sovereign immunity and in granting summary judgment to the Sheriff on that basis. We disagree.

> Under the Georgia Constitution, . . . sovereign immunity extends to the state and all of its departments and agencies. The sovereign immunity of the state and its departments and agencies can only be waived by an Act of the General Assembly which specifically provides that sovereign immunity is thereby waived and the extent of such waiver. Sovereign immunity has been extended to counties and thus protects county employees who are sued in their official capacities, unless sovereign immunity has been waived.

(Citations and punctuation omitted.) *Butler v. Carlisle*, 299 Ga. App. 815, 818 (1) (683 SE2d 882) (2009). See Ga. Const. of 1983, Art. I, Sec. II, Par. IX (e). See also OCGA § 36-1-4 ("A county is not liable to suit for any cause of action unless made so by statute."). Accordingly, a sheriff sued in his official capacity may invoke the county's sovereign immunity unless it has been waived by the county. *Nichols v. Prather*, 286 Ga. App. 889, 893 (2) (650 SE2d 380) (2007).

10

"Under Georgia law, sovereign immunity is an immunity from suit, rather than a mere defense to liability, and, therefore, whether a governmental defendant has waived its sovereign immunity is a threshold issue." *McCobb v. Clayton County*, 309 Ga. App. 217, 217-218 (1) (a) (710 SE2d 207) (2011). The issue of sovereign immunity and its waiver generally should be considered before addressing issues of causation. *Cameron v. Lang*, 274 Ga. 122, 126 (3) (549 SE2d 341) (2001). "Any waiver of sovereign immunity must be established by the party seeking to benefit from that waiver." *Butler*, 299 Ga. App. at 818 (1).

The plaintiffs rely on the statutory waiver of sovereign immunity for the negligent use of county motor vehicles. More specifically, the plaintiffs rely on OCGA § 33-24-51 (b), which provides for a waiver of county sovereign immunity "for a loss arising out of the negligent use of a covered motor vehicle," up to the limits of insurance coverage purchased by the county or the minimum monetary limits required by OCGA §36-92-2 (a).[5] The sovereign immunity afforded a sheriff sued in

---

[5] OCGA § 36-92-2 (a) similarly provides for the waiver of sovereign immunity of a county "for a loss arising out of claims for the negligent use of a covered motor vehicle," and it provides for an automatic waiver of immunity up to certain specified limits, regardless of whether the county purchases any insurance. However, OCGA § 36-92-2 (d) (3) provides that the amount of the waiver "shall be increased to the extent that[] . . . [t]he local government entity purchases commercial liability insurance in an amount in excess of the waiver amount set forth in this Code section."

his official capacity is waived if the criteria in OCGA § 33-24-51 (b) have been met. *Nichols*, 286 Ga. App. at 893-894 (2).

The general rule is that injury to an innocent third-party driver arising out of a police car chase is considered a loss "arising out of the negligent use of a covered motor vehicle" for purposes of OCGA § 33-24-51 (b), where "an officer acted with reckless disregard for proper law enforcement procedures in pursuing a fleeing suspect." *Strength v. Lovett*, 311 Ga. App. 35, 38-39 (1) (714 SE2d 723) (2011), quoting *McCobb*, 309 Ga. App. at 221 (1) (c). See *City of Atlanta v. Lockett*, 312 Ga. App. 19, 21 (1) (717 SE2d 529) (2011). But,

> [a] determination of whether an event arises from the "use" of a motor vehicle depends largely on the circumstances, and a bright-line definition is elusive. [Moreover,] statutes that provide for a waiver of sovereign immunity, such as OCGA § 33-24-51, are in derogation of the common law and thus are to be strictly construed against a finding of waiver.

(Citation, punctuation, and emphasis omitted.) *Board of Commrs. of Putnam County v. Barefoot*, 313 Ga. App. 406, 408-409 (1) (721 SE2d 612) (2011).

Strictly construing the term "use" in the context of sovereign immunity, we have held that an injury sustained when a county motor vehicle is "immobile and

12

undergoing maintenance" does not arise out of the "use" of the vehicle, *Columbus Consolidated Govt. v. Woody*, 342 Ga. App. 233, 238 (802 SE2d 717) (2017), and that "use" of a motor vehicle means "motor vehicles that were actively in use when the injury arose." *Barefoot*, 313 Ga. App. at 409 (1). See *Gish v. Thomas*, 302 Ga. App. 854, 861 (2) (691 SE2d 900) (2010) (concluding that injury did not arise out of "use" of motor vehicle, where patrol car was not being used "*as a vehicle*" when the injury occurred) (emphasis in original); *Williams v. Whitfield County*, 289 Ga. App. 301, 305 (656 SE2d 584) (2008), superceded by statute on other grounds, as stated in *Woody*, 342 Ga. App. at 237, n. 4 (concluding that injury did not arise out of "use" of motor vehicle, where injury occurred when county "vehicle was merely present as a static physical mass"); *Saylor v. Troup County*, 225 Ga. App. 489, 490 (484 SE2d 298) (1997) (concluding that injury did not arise out of "use" of motor vehicle, where injury occurred when county "van was inoperative, parked off the roadway with its engine not engaged"). Cf. *Old Republic Union Ins. Co. v. Floyd Beasley & Sons*, 250 Ga. App. 673, 676 (2) (551 SE2d 388) (2001) (trailer was not in "use" under insurance policy unless trailer "was being 'utilized' in the plain and ordinary sense of the word" when the injury occurred and "was still operating as a trailer at the time of the accident") (citations omitted). Thus, while the term "use" of a motor vehicle

13

"does extend beyond actual physical contact, it does not imply remoteness," and the term contemplates "use of the motor vehicle *as a vehicle*" at the time of the injury. (Citations omitted; emphasis in original.) *Barefoot*, 313 Ga. App. at 409 (1).

The uncontroverted evidence in the present case shows that by the time the plaintiffs were injured by the fleeing driver, the Lamar deputy's patrol car was immobile and inoperative on the side of the road approximately 20 miles away as the result of a blown tire. Following the tire blowout, the Lamar deputy was unable to participate in the chase as it continued on I-475 and onto the more congested Highway 247 and had no control over the decision whether to terminate the pursuit. Accordingly, because the Lamar County patrol car undisputedly was disabled and unable to participate in the pursuit when the collision occurred, the plaintiffs' injuries did not arise out of the "use" of the patrol car as that term has been strictly construed by our precedent. See *Woody*, 802 SE2d at 721; *Barefoot*, 313 Ga. App. at 409 (1); *Gish*, 302 Ga. App. at 861 (2); *Williams*, 289 Ga. App. at 305; *Saylor*, 225 Ga. App. at 490. It follows that the sovereign immunity of the Lamar Sheriff was not waived under OCGA § 33-24-51 (b), and that the trial court committed no error in granting summary judgment to him on that basis.

2. The plaintiffs also argue that the trial court erred in concluding that they failed as a matter of law to prove proximate causation for their claims against the Lamar Sheriff because the pursuit was under the exclusive control of the Monroe deputies when the collision occurred and in concluding there was no evidence that the Lamar deputy acted with reckless disregard for proper law enforcement procedures. We need not address these arguments in light of our conclusion in Division 1 that summary judgment was properly granted to the Lamar Sheriff on sovereign immunity grounds.

3. Lastly, the plaintiffs argue that the trial court erred in concluding that there was no evidence that the Monroe deputies acted with reckless disregard for proper law enforcement procedures by continuing the pursuit of the fleeing driver until the collision occurred and in granting summary judgment to the Monroe Sheriff on that ground. We agree with the plaintiffs.

Even where a plaintiff proves that county sovereign immunity has been waived based on county motor vehicle use, the plaintiff

> must still prove the more culpable conduct that is required to sustain a claim for damages under OCGA § 40-6-6 (d) (2). Specifically, a police pursuit will not constitute the proximate cause of the plaintiff's damages unless the plaintiff can establish that the law enforcement officer acted

15

with reckless disregard for proper law enforcement procedures in the officer's decision to initiate or continue the pursuit.

(Citation and punctuation omitted.) *Lockett*, 312 Ga. App. at 21-22 (2). In the context of a decision by a county deputy to continue a pursuit, the "reckless disregard" standard found in OCGA § 40-6-6 (d) (2) requires a showing by the plaintiff that "the deputy chose to continue the dispute with conscious indifference to whether continuing the pursuit violated proper law enforcement procedures." (Punctuation omitted.) *Strength*, 311 Ga. App. at 42 (2) (a). Whether a deputy acted with reckless disregard "will generally be a question for the jury [because] it is only in a plain and undisputed case that the courts, rather than the jury, can make that determination." *Thompson v. Payne*, 216 Ga. App. 217, 219 (453 SE2d 803) (1995). Mindful of this reckless disregard standard, we turn to the record here.[6]

---

[6] Georgia courts have not resolved the question of exactly what procedures—the procedures that a reasonable law enforcement agency would adopt, the standard procedures that most law enforcement agencies have adopted, or the actual procedures that the agency employing the pursuing officer in a particular case has adopted—are the "proper law enforcement procedures" to which OCGA § 40-6-6 (d) (2) refers.

*Strength*, 311 Ga. App. at 41 (2) (a). But we need not resolve this question because, as explained infra, there is evidence that the Monroe deputies' decision to continue the pursuit is inconsistent with both the Monroe County pursuit procedures and proper law enforcement procedures more generally. See id. (concluding that there was

16

The pursuit procedures of the Monroe County Sheriff's Department provide that when a driver refuses to stop,

> [t]he responsibility for the decision to pursue and methods to be employed rest solely with the individual deputy. . . . In arriving at his decision, the deputy must carefully consider all factors involving possible consequences, and most importantly, the safety of the public, whose protection is his major objective. Deputies shall be held accountable for their decisions and actions. They must strive to exercise restraint and good judgment.

> Deputies should take into account weather, road and traffic conditions, driver and vehicle capabilities, and probability of a successful, safe conclusion of the action. They should evaluate whether the violation warrants the seriousness of a high-speed pursuit.

---

record evidence that "the standard policy of law enforcement agencies with respect to pursuits of fleeing suspects and the actual policy of the Richmond County Sheriff's Office on the same subject are not that different" and had both been violated by the sheriff's deputy); *Lang v. Becham*, 243 Ga. App. 132, 133-134 (530 SE2d 746) (2000) (concluding that there was evidence that the decision of the sheriff's deputy to pursue the fleeing driver violated the "Peach County Sheriff's Department's standard operating procedures . . . on the subject of high speed vehicular pursuits of criminal suspects" as well as "proper law enforcement procedures" more generally).

The county procedures further address when a pursuit should be abandoned by a deputy,[7] providing that a pursuit "will be discontinued when[ ] [w]eighing the facts, the gravity of the offense and the prospect of losing the suspect will not balance with the hazards to the public and to the deputy." The county procedures also state that a pursuit "will be discontinued" by the deputy when "[t]he violator is known or information comes to light that would allow later apprehension and successful prosecution," or "[t]he nature of the suspected crime is such that continuation of the pursuit is unjustified."

Viewed in the light most favorable to the plaintiffs with all inferences in their favor, the dash cam video recordings from the Lamar patrol car and one of the Monroe patrol cars, the transcripts of the audio recordings of the deputies' communications with each other and the police dispatchers, and the deposition testimony of the deputies and the plaintiffs' experts would authorize the conclusion that the Monroe deputies acted with reckless disregard of the Monroe County pursuit

---

[7] Monroe County procedures state that the decision to terminate a pursuit remains with the deputy "until a supervisor becomes aware and takes command of the situation." While there is evidence that Monroe County supervisors listened over the radio as the pursuit ensued, a jury could find from the dash cam video recordings and audio recorded police communications that they never took "command of the situation" away from the pursuing deputies.

procedures in deciding to continue the high speed chase of the fleeing driver. In this regard, there is evidence reflecting that the pursuit of the fleeing driver was initiated based on the minor traffic violation of failing to maintain a lane,[8] and that the Monroe deputies were informed by the police dispatcher that the pursuit had arisen out of a "routine traffic stop" and that there were no "warrants . . . or anything like that" for the driver. The evidence also reflects that during the police chase, the fleeing driver reached speeds of 120 to 125 miles per hour, aggressively wove in and out of traffic, traveled into the emergency lane and grassy median to avoid near collisions, and drove through red lights at congested intersections.

The evidence construed in the plaintiffs' favor further reflects that when faced with the aforementioned circumstances, the Monroe deputies chose to continue the pursuit of the fleeing driver, despite their admitted knowledge of the Monroe County pursuit procedures requiring them to weigh the gravity of the suspect's offense and hazard to the public. Nor do the recorded audio communications of the Monroe deputies and dispatchers reflect that the deputies ever inquired further into the

---

[8] The Lamar deputy testified that he was concerned that the driver was impaired, but a jury could conclude otherwise based on the dash cam video recordings and the transcripts of the audio recordings of the deputies' communications.

19

specific reason for the pursuit or discussed whether the pursuit should be discontinued in light of the driver's aggressive behavior and congested traffic conditions. Additionally, the Monroe deputies continued the pursuit, despite the fact that the license tag number of the fleeing car had been identified and the car linked to a particular Florida rental car company, thereby providing a potential means for later tracking down the fleeing driver, a factor that weighed in favor of discontinuing a pursuit under Monroe County's procedures. Furthermore, the plaintiffs experts, Geoffrey Alpert and Donald Van Blaricom, opined that the decision to continue the pursuit under the circumstances of this case violated Monroe County pursuit procedures and proper law enforcement procedures in general, including policy recommendations for pursuits developed by the Georgia Municipal Association and the Georgia Association of Chiefs of Police Executive Board.

This combined evidence, construed in favor of the plaintiffs, demonstrates that genuine issues of material fact exist regarding whether the Monroe deputies chose to continue the pursuit with conscious indifference to whether doing so violated proper law enforcement procedures. See *Strength*, 311 Ga. App. at 41-42 (2) (a) (finding genuine issue of material fact as to whether deputy acted with reckless disregard for proper law enforcement procedures in deciding to initiate and continue the pursuit,

20

given evidence of, among other things, the dangerous driving behavior of the suspect during the chase, the deputy's knowledge of county pursuit procedures, and the expert testimony opining that the deputy violated proper law enforcement procedures); *Lang*, 243 Ga. App. at 133-134 (genuine issue of material fact existed as to whether deputy acted with reckless disregard for proper law enforcement procedures, where the deputy was aware of county pursuit policies, and the plaintiff presented expert testimony that the deputy should have discontinued the pursuit under the county policies and under law enforcement pursuit policies more generally). While there was testimony from the Monroe deputies reflecting that they had carefully assessed the circumstances surrounding the chase and whether it was safe to proceed with the pursuit, a jury could reach the opposite conclusion, particularly in light of the speed and aggressive driving of the fleeing suspect as shown on the dash cam video recordings. See *Strength*, 311 Ga. App. at 42 (2) (a) (noting that "[a]lthough the deputy testified that he did not believe the pursuit posed any great risk to the public, a jury could conclude otherwise, especially considering that the deputy had observed [the driver] recklessly overtake other vehicles on the road."). Accordingly, the question whether the Monroe deputies acted with reckless disregard for proper law

21

enforcement procedures under OCGA § 40-6-6 (d) (2) when they chose to continue the high speed pursuit of the fleeing driver is for a jury to resolve.

(a) Instead concluding that there was no evidence that any of the deputies in this case acted with reckless disregard of proper law enforcement procedures, the trial court stated in its summary judgment order that "neither the [p]laintiffs nor their experts have pointed to any authority from any source–not a case, not a law enforcement guideline, not a state policy, not a majority rule, not anything of the kind–establishing the sweeping assertion that all pursuits for minor traffic incidents are prohibited." According to the trial court, the plaintiffs' experts, Alpert and Van Blaricom, had asserted that proper law enforcement procedures contain a "blanket prohibition against pursuits for minor traffic offenses," and the experts' "primary criticism" of the Monroe deputies was that "no high speed pursuit should *ever* be initiated for a minor traffic offense." The trial court concluded that there was no support for such a "blanket prohibition" other than the unsupported personal beliefs of the plaintiffs' experts and, therefore, that the plaintiffs had failed to point to any evidence creating a genuine issue of material fact as to whether the Monroe deputies acted with reckless disregard in continuing the pursuit.

22

However, contrary to the trial court's characterization of their expert opinion testimony, Alpert and Van Blaricom did not simply opine that the decision of the Monroe deputies to continue the pursuit violated proper law enforcement procedures because "all pursuits for minor traffic incidents are prohibited" and because "high speed pursuits can never appropriately be initiated or continued for a minor traffic offense." The record instead reflects that Alpert[9] testified during his deposition that many police departments restrict pursuits to drivers suspected of violent crimes, while other departments, like Monroe County, take a more discretionary approach involving a balancing test. Likewise, Van Blaricom[10] testified that there are different types of

---

[9] According to Alpert's affidavit and curriculum vitae and as noted in a prior opinion of this Court,

Alpert, a professor of criminology, has conducted extensive research in the field of police pursuits, including applicable policies and procedures, for approximately 30 years, and in the course thereof he has interviewed hundreds of officers and hundreds of suspects and has evaluated thousands of official police pursuit records. Alpert has also authored numerous peer reviewed articles on the subject of police chases.

*Clayton County v. Segrest*, 333 Ga. App. 85, 89 (2) (a) (775 SE2d 579) (2015) (physical precedent only).

[10] Van Blaricom served for approximately 30 years as a law enforcement officer, including 11 years as chief of police in Bellevue, Washington. According to Van Blaricom's affidavit and curriculum vitae, he has conducted research in the area of police pursuits, was the first individual to develop a police pursuit standard in 1975, and has published in the field of police pursuits and police practices, including articles specifically addressing the necessary training and standards for police

pursuit policies adopted by police departments around the United States, including restrictive policies limited to violent crimes, as well as more discretionary policies in which officers are authorized to exercise greater judgment. However, neither expert suggested that Monroe County's actions only violated pursuit procedures that restrict police chases to violent crimes. Rather, Van Blaricom opined that "even under a discretionary police pursuit procedure" requiring the balancing of several factors, the Monroe deputy's decision to continue the pursuit was unjustified, and Alpert concurred with Van Blaricom's opinion.

Furthermore, in rendering their opinions about the pursuit, the plaintiffs' experts did not merely opine that the Monroe deputies violated proper law enforcement procedure solely because the initial basis for the pursuit was a minor traffic offense. Rather, Alpert indicated that the Monroe deputies violated Monroe County procedures and general law enforcement procedures by deciding to continue

> a high speed pursuit for a minor traffic violation under the circumstances presented in this litigation on an interstate highway and in a crowded urban environment over the distance and times noted involving speeds in excess of 125 miles per hour during which the fleeing vehicle was observed to violate multiple rules of the road and undoubtedly

pursuits to prevent unnecessary injury or death to the motoring public.

24

terrorizing and putting at risk innocent members of the motoring public[.]

Alpert further opined that the Monroe deputies had violated proper law enforcement procedures by "getting caught up in the chase" without knowing the specific reason the driver was being pursued so that it could be weighed against the hazards of a chase and by deciding to continue the pursuit off the interstate "into a relatively congested mall area where the collision occurred." Similarly, Van Blaricom opined that the Monroe deputies violated Monroe County procedures and general law enforcement procedures by deciding to continue the pursuit for a minor traffic violation where the fleeing driver was "approaching 125 miles per hour for over 40 miles, without even knowing the reason for the pursuit." According to Van Blaricom, the Monroe deputies violated proper law enforcement procedure by deciding to continue the pursuit of a driver fleeing over such a long distance, at such a high speed, and into more congested traffic.

The trial court overlooked this more specific opinion testimony from the plaintiffs' experts that, when combined with the other evidence in the record discussed supra, created a genuine issue of material fact for purposes of summary judgment on the issue of reckless disregard. See *Strength*, 311 Ga. App. at 41-42 (2)

25

(a) (expert testimony that deputy violated proper law enforcement procedures, along with other evidence, created genuine issues of material fact as to whether deputy acted with reckless disregard); *Lang*, 243 Ga. App. at 133-134 (expert testimony that deputy should have discontinued pursuit under county policy and general law enforcement procedures, along with other evidence, created genuine issues of material fact as to whether deputy acted with reckless disregard).[11] On summary judgment, the trial court was required to give the plaintiffs "the benefit of the most favorable version of [the expert] testimony as a whole which the jury would be authorized to accept," *Whitley v. Piedmont Hosp.*, 284 Ga. App. 649, 655 (1) (644 SE2d 514) (2007) (citation and punctuation omitted), which the trial court did not do in this case.

(b) In granting summary judgment to the Monroe Sheriff, the trial court also concluded that the Monroe deputies' decision to continue the pursuit of the fleeing driver did not rise to the level of reckless disregard as a matter of law because "the

---

[11] The Monroe Sheriffs did not file a motion under OCGA § 24-7-702 (b) and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (113 SCt 2786, 125 LE2d 469) (1993), challenging the admissibility of the expert testimony of Albert and Van Blaricom. "Consequently, we . . . consider only whether the record as we now find it–including the opinions of the expert[s]–is enough to get [the plaintiffs] past summary judgment." (Citation and punctuation omitted.) *Toyo Tire North American Mfg. v. Davis*, 299 Ga. 155, 161 (2) (787 SE2d 171) (2016).

deputies were not pursuing solely based on a minor traffic offense" once they joined the chase. In this regard, the trial court found that the driver was committing the felony of fleeing and attempting to elude a police officer (i.e., fleeing from the Lamar deputy) by the time the Monroe deputies joined the pursuit,[12] thereby justifying the Monroe deputies' decision to continue the chase, such that their decision was not done with reckless disregard under OCGA § 40-6-6 (d) (2). The trial court erred in its reliance on the offense of fleeing and attempting to elude as justification for the continued police chase.

---

[12] OCGA § 40-6-395 provides in part:
(a) It shall be unlawful for any driver of a vehicle willfully to fail or refuse to bring his or her vehicle to a stop or otherwise to flee or attempt to elude a pursuing police vehicle or police officer when given a visual or an audible signal to bring the vehicle to a stop. The signal given by the police officer may be by hand, voice, emergency light, or siren. The officer giving such signal shall be in uniform prominently displaying his or her badge of office, and his or her vehicle shall be appropriately marked showing it to be an official police vehicle. . . .
(b) (5)(A) Any person violating the provisions of subsection (a) of this Code section who, while fleeing or attempting to elude a pursuing police vehicle or police officer:
(i) Operates his or her vehicle in excess of 20 miles an hour above the posted speed limit . . . .
shall be guilty of a felony punishable by a fine of $5,000.00 or imprisonment for not less than one year nor more than five years or both.

27

A statute should not be construed in a manner that would defeat its clear legislative purpose as reflected in the plain statutory language or that would render its provisions meaningless. *Roseburg Forest Products Co. v. Barnes*, 299 Ga. 167, 171 (2) (787 SE2d 232) (2016). And, as our Supreme Court has explained, in enacting OCGA § 40-6-6 (d) (2), "the legislature intended to grant police officers and drivers of emergency vehicles exceptional rights in operating motor vehicles, but also to protect travelers from an officer's or driver's reckless disregard of the public's safety on the highways." *Cameron*, 274 Ga. at 128 (4). That statutory balance between the rights of officers and the protection of innocent drivers would be defeated and the statute rendered meaningless, however, if the continuance of a pursuit was considered justified as a matter of law simply because the fleeing motorist was committing the offense of fleeing or attempting to elude a police officer, which would be true in virtually every case. See OCGA § 40-6-395 (a). Such a rule would impermissibly permit officers to justify a pursuit that never should have been initiated or continued by bootstrapping a claim of fleeing or attempt to elude the officers, thereby undercutting the protections afforded to innocent drivers by OCGA § 40-6-6 (d) (2). The trial court therefore erred in concluding as a matter of law that the fleeing

driver's commission of the offense of fleeing or attempting to elude the Lamar deputy justified the continued pursuit of the driver by the Monroe deputies.

(c) Lastly, in granting summary judgment to the Monroe Sheriff, the trial court also found that as the Monroe deputies pursued the fleeing driver, he threw a white powdery substance from his car, which gave the deputies "reason to suspect that [he] might have illegal drugs in his vehicle, giving them an additional reason to continue the pursuit" and reflecting that their decision did not rise to the level of reckless disregard under OCGA § 40-6-6 (d) (2) as a matter of law. The trial court erred in its reliance on the alleged throwing of the white powder as a basis for granting summary judgment.

As an initial matter, even if we assume that the evidence regarding the thrown white powder was undisputed, based on the combined evidence previously discussed, a jury would be entitled to find that the Monroe deputies should have discontinued the pursuit once they took the lead in the chase *before* the alleged white powder incident occurred. In any event, although the parties dispute what would have been captured by the recordings, the one dash cam video recording from a Monroe County patrol car contained in the record does not show a white powdery substance being thrown or striking any of the patrol cars and exploding, the audio recorded police

29

communications that occurred during the case do not contain any reference to the thrown powder, and the driver was never prosecuted for any drug offenses pertaining to the alleged thrown powder. Given this record, the evidence did not demand a finding that the fleeing driver threw a white powder substance out of his window during the pursuit. See *Smith v. Wal-Mart Stores East, L. P.*, 330 Ga. App. 340, 348 (2) (b) (ii) (765 SE2d 518) (2014) (trial court erred in granting summary judgment to defendant in light of video recording that a jury could find supported the plaintiff's version of events).

For these combined reasons, the trial court erred in granting summary judgment to the Monroe Sheriff on the plaintiffs' claims. In contrast, the trial court committed no error in granting summary judgment to the Lamar Sheriff on the plaintiffs' claims against him on the basis of sovereign immunity.

*Judgment affirmed in part and reversed in part. McMillian, J., concurs in judgment only to Division 3(b) and 3(c), and concurs fully in Division 1, 2, and 3(a). Mercier, J., concurs in judgment only to Division 3(c), concurs fully in Division 1, 2, and 3(a) and (b).*

**\*DIVISIONS 3(B) AND 3(C) OF THIS OPINION ARE PHYSICAL PRECEDENT ONLY. COURT OF APPEALS RULE 33.2.**